# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin E. Aspen | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 95 C 3275 | **DATE** | 6/14/2001 |
| **CASE TITLE** | JMS DEVELOPMENT vs. BULK PETROLEUM | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter Report and Recommendation. The Court recommends that Plaintiff's Amended Petition for Rule to Show Cause be granted in part, and that Plaintiff's Supplemental Petition for Attorney's Fees be granted in part.** AK

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| x | Notices mailed by judge's staff. | | JUN 15 2001 | |
| | Notified counsel by telephone. | | | 104 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 JUN 14 PM 3:31 | date mailed notice | |
| | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JMS DEVELOPMENT COMPANY, | No. 95 C 3275 |
| Plaintiff, | Judge Marvin E. Aspen |
| v. | |
| BULK PETROLEUM CORPORATION, et al. | Magistrate Judge Arlander Keys |
| Defendant. | |

DOCKE
JUN 1 5 200?

TO: THE HONORABLE MARVIN E. ASPEN
UNITED STATES DISTRICT COURT JUDGE

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff JMS Development Company's ("JMS") Amended Petition for Rule to Show Cause Against Bulk Petroleum Corporation and Mr. Darshan Dhaliwal, Individually (collectively referred to as "Defendants"), and Plaintiff's Supplemental Petition for Attorney's Fees. Because the Court finds that Defendants have failed, on numerous occasions, to honor the Consent Decree, and have not in good faith tried to expeditiously obtain the "no further action" remediation letter from the Illinois Environmental Protection Agency ("IEPA"), the Court recommends that Plaintiff's Amended Petition for Rule to Show Cause be granted in part, and that Plaintiff's Supplemental Petition for Attorney's

Fees be granted in part.

## BACKGROUND

In June 1995, JMS brought suit against Defendants, seeking damages for the environmental contamination to the JMS property allegedly caused by Bulk Petroleum Corporation's ("Bulk") activities on the property. On August 25, 1997, JMS and Defendants executed a Consent Decree, which was entered by Judge Aspen on September 18, 1997.[1] Pertinent parts of the Consent Decree are as follows:

> (a) Bulk shall, at its sole cost and expense, prepare, *in consultation with JMS,* a report for submittal to the Illinois Environmental Protection Agency ("IEPA") pursuant to IEPA's tiered approach to corrective action objectives policy. The report will set forth data . . . sufficient to support a petition to IEPA for the issuance of a written notice that the JMS Property does not exceed IEPA risk-based cleanup requirements under the commercial/industrial closure scenario and that IEPA therefore will not require remediation at the JMS Property. . . . Bulk and JMS will file with the IEPA the report and will request administrative closure of the JMS Property in the form of a "no further remediation" letter.
> \* \* \*
> (c) Bulk will *use its best efforts* to obtain administrative closure of the JMS property *within a reasonable time.* Bulk Petroleum will submit an application for participation in the Site Remediation Program *within 60 days of execution* of this Consent

---

[1] On May 13, 1998, Judge Aspen referred post-decree enforcement matters to this Court pursuant to General Rule 2.41(b).

-2-

Decree, and will provide JMS with copies of all correspondence sent to and received from the IEPA in connection with the application. Upon request of JMS, Bulk Petroleum will provide a status reports [sic] to JMS explaining the progress of the application and the steps taken by Bulk Petroleum to expedite the process of obtaining a "no further remediation" letter from IEPA.

(Consent Decree, Section VI (C)(2)(a) and (c).) (emphasis added.)

Paragraph 11 of the Consent Decree further provides that "a prevailing party in an action to enforce the terms of this Consent Decree shall be entitled to the recovery of all costs of enforcement including attorney's fees and costs."[2] (Consent Decree, Section VI (C)(11).) On May 6, 1998, JMS filed its (original) Petition for Attorney's Fees. The Petition, covering the time period from April 28, 1998 to July 15, 1998, seeks $3803.00 in attorney fees and costs associated with JMS's counsel's preparation of and court appearances relating to the Petition to Show Cause. On June 9, 1999, the parties advised the Court that the fee petition associated with the Petition to Show Cause was being addressed by the parties, and would have a better chance of

---

[2] The Consent Decree also provides that, if Bulk fails to comply with the provisions of the Consent Decree, then Darshan Dhaliwal, individually, would be jointly and severally liable with Bulk for compliance with the terms of the Consent Decree. (Consent Decree, Section VI (C)(8).) Therefore, both Mr. Dhaliwal, individually, and Bulk are jointly and severally liable for the fees and costs recommended to be awarded to JMS in this Report and Recommendation.

-3-

being resolved after the close of the case. Accordingly, this Court postponed ruling on the (original) Petition for Attorney's Fees, as well as the Petition to Show Cause.

However, it is now more than three years since JMS filed its (original) Petition for Attorney's Fees and Petition to Show Cause, and, as explained in more depth *infra*, Bulk and Mr. Dhaliwal appear no closer than before to fulfilling the terms of the Consent Decree.³ Therefore, on February 23, 2001, JMS filed its Amended Petition to Show Cause, requesting, *inter alia*, that JMS be allowed to take the steps necessary, under the Consent Decree, to obtain administrative closure of its property, and charge the resulting expenses to Defendants. JMS also requested that it be awarded fees and costs pursuant to paragraph 11 of the Consent Decree. Accordingly, on April 9, 2001, JMS filed its Supplemental Petition for Attorney's Fees, which requested the fees and costs associated

---

³ The Consent Decree requires, *inter alia*, that Bulk submit a report to the IEPA indicating that the JMS Property does not exceed the cleanup requirements under the Commercial Industrial Closure scenario, and, significantly, that Bulk apply for a "no further action" letter from the IEPA. Because it is now June 2001 - and Bulk does not appear to be even close to satisfying the objectives of the Consent Decree - JMS has filed an Amended Petition for Rule to Show Cause, where, essentially, JMS requests that it be allowed to clean-up the land itself, and obtain the "no further action" letter from the IEPA, and charge the costs directly to Bulk and Mr. Dhaliwal.

-4-

with its (original) Petition for Attorney's Fees, as well as new fees and costs, covering the period from July 15, 1998 to March 30, 2001, associated with trying to enforce the Consent Decree (such as numerous court appearances) and the filing of its Amended Petition to Show Cause.

In order to analyze the Amended Petition to Show Cause and the Supplemental Petition for Attorney's Fees - the relevant Motions before the Court - it is necessary to address issues raised (but which were postponed, see supra) in JMS's (original) Petition for Attorney's Fees, which the Supplemental Petition references and incorporates. The Court also finds it relevant (and disturbing) that Bulk - especially Mr. Dhaliwal - does not appear to be taking compliance with the Consent Decree seriously. In fact, Mr. Dhaliwal has had four separate sets of counsel since the District Court entered the Consent Decree in September of 1997.[4] It appears to the

---

[4] Specifically, on May 26, 1998, Defendants requested leave of the Court to withdraw the appearances of the law firm Wildman, Harrold, Allen & Dixon, and attorneys Sanford M. Stein and Louise Goodwin. New attorneys Michael Devine, Stuart Berks, and James Edward O'Halloran filed their appearances for Defendants on July 15, 1998. On September 13, 1999, however, Defendants' counsel informed the Court that Mr. Dhaliwal terminated their services, and this Court gave Defendants until September 20, 1999 to retain new counsel, admonishing them - by minute order - that it would not allow another substitution of counsel to further delay the resolution of matters before the Court. On September 20, 1999,
(continued...)

Court that Mr. Dhaliwal keeps terminating his attorneys in order to delay his responsibilities under the Consent Decree. In their May 26, 1998 Motion for Leave to Withdraw, Mr. Stein and Ms. Goodwin stated that, since the entry of the Consent Decree, they had "zealously represented" Defendants in taking steps to obtain the "no further action" remediation letter from the IEPA, but that they had encountered "irreconcilable differences" with Defendants that would require them to withdraw. The Court also notes that, just as it appeared that some progress was being made between JMS counsel and Ms. Patel - one of Defendants' third set of lawyers - that firm withdrew. Ms. Patel had represented to the Court on January 17, 2001 - apparently based on what Defendants had told her - that Defendants had submitted a Corrective Action Report to the IEPA and that they were awaiting a response. Shortly thereafter it was learned that no new Corrective Action Report had been filed, which likely led to Counsel's decision to withdraw. Therefore, because

---

[4](...continued)
attorneys Timothy Scott Harris and Panna P.I. Patel entered their appearances for Defendants. Nonetheless, on February 12, 2001, Defendants (again) filed a motion to withdraw Mr. Harris as counsel, which the District Court granted. On March 1, 2001, this Court granted attorney Patrick Gerard Cooke leave to file his appearance. Therefore, since entry of the Consent Decree, Defendants have had four separate sets of attorneys, and minimal, if any, real progress has been made towards the obtainment of the "no further action" letter from the IEPA.

the Court finds that Mr. Dhaliwal[5] has acted in bad faith, the Court recommends that any ambiguity in the fees and costs be interpreted in favor of JMS.

A. **The (Original) Petition for Attorney's Fees and Petition for Rule to Show Cause.**

The (original) Petition for Attorney's Fees and Petition for Rule to Show Cause largely focused on Bulk's failure to keep JMS adequately informed as to the steps being taken by Bulk to submit a Corrective Action Plan to the IEPA, as well as Bulk's excuses (which continue until the present day) for not complying with essential terms of the Consent Decree. Because many of the issues raised in the (original) Petition for Attorney's Fees and Petition for Rule to Show Cause took place more than three years ago - and the parties have clearly moved on - the Court merely discusses some of the more egregious examples to show why it recommends that Defendants be ordered to pay the fees and costs associated with the Petition for Rule to Show Cause filed in 1998 (which the Supplemental Fee Petition incorporates). A brief discussion of some of the issues in 1998 will also illustrate Defendants' bad faith in

---

[5] Significantly, the Court does not find that any of Mr. Dhaliwal's attorneys have acted in bad faith. On the contrary, it appears that, as each set of attorneys has tried to comply with the Consent Decree, Mr. Dhaliwal has terminated their services.

complying with the Consent Decree - conduct that, unfortunately, has persisted until the present day.

In the (original) Fee Petition filed on May 6, 1998 (and the ensuing Reply filed on October 26, 1998), JMS emphasized that Defendants failed to keep it timely informed of developments with respect to filing a report with the IEPA requesting administrative closure of the property in the form of a "no further remediation" letter. Defendants contended that, on September 23, 1997, they submitted a Corrective Action Completion Report ("the Report") to the IEPA, which was received by the agency the next day. According to Defendants, the IEPA did not respond until April 24, 1998, at which time the Report was rejected, and that from September 23, 1997 (when the Report was submitted) to April 24, 1998 (when it was rejected), Defendants were unable to advise JMS as to any developments, because there were none. However, as clarified by JMS in its Reply, a review of the Report illustrates that the Report did not relate to the JMS property, located at 9340-9330 West Ballard Road, Des Plaines, IL., but rather related to Defendants' property located at 9001 North Potter, Des Plaines, IL. Furthermore, JMS explained that, had Defendants first consulted with them about

filing the Report - as required by the Consent Decree[6], JMS would have quickly realized that the Report did not pertain to the JMS Property. By not first consulting with JMS, Defendants violated the Consent Decree. Defendants also did not forward a copy of the Report to JMS until August of 1998 - although they filed it in September 1997, and received the response from the IEPA in April of 1998. Additionally, although Defendants stated that they retained ISO Technologies, Inc. (environmental consultants) to address the IEPA's unresolved issues in the Report, Defendants did not do so until July 13, 1998 - despite Defendants having received the IEPA's rejection in April of 1998.[7] Clearly, in 1998, Defendants did not appear to be taking their responsibilities under the Consent Decree seriously, and were certainly not using their "best efforts to obtain administrative closure of the JMS property within a

---

[6] The Consent Decree states, in relevant part: "Bulk shall, at its sole cost and expense, prepare, *in consultation with JMS*, a report for . . . submittal to the Illinois Environmental Protection Agency . . ." (Consent Decree, Section VI(C)(2)(a).)(emphasis added).

[7] As pointed out by JMS, a status hearing on this case was set for July 15, 1998, which most likely prompted Defendants to contact ISO Technologies, Inc. on July 13th, although Defendants had received the rejection from the IEPA back in April 1998. Furthermore, JMS explained that the retention agreement with ISO Technologies, Inc. disclosed that the subject matter property was the 9001 North Potter and not the JMS property.

reasonable time."

Finally, one last point is worth mentioning from 1998, because it further illustrates Defendants' delay and bad faith: Although the Consent Decree provides that Defendants were to submit an application for participation in the Site Remediation Program within sixty days of the filing of the Consent Decree (which was executed on September 18, 1997), by January 13, 1998 – well after the sixty days – Counsel for Defendants sent a letter to Counsel for JMS, stating that Bulk had engaged environmental consultants and engineers with the goal of submitting an application for participation in the IEPA's Site Remediation Program, but needed an additional thirty days. (*See* Defendants' Response to (original) Petition for Attorney's Fees ("Response to (original) Petition") at ¶ 9.) However, later on in their Response to (original) Petition, Defendants apparently backtracked in their commitment to apply for participation in the Site Remediation Program, because Defendants stated, in paragraph 13, that they had not submitted an application for participation in the Site Remediation Program to the IEPA. In fact, Defendants stated that such participation was "unnecessary and inappropriate" insofar as Bulk was participating in the Illinois Leaking Underground Storage Tank ("LUST") program, and that they reasonably believed that they could obtain the "no further action"

letter sought by JMS under the LUST program. However, it is now June 2001, and Defendants have not obtained the "no further action" letter (whether from the LUST program or the Site Remediation Program), and, in fact, as discussed *infra*, the parties are no closer to administrative closure than they were in September 1997.

In JMS's (original) Petition for Attorney's Fees, it requested $3803.00 in attorney fees and costs for the time period from April 28, 1998 to July 15, 1998, which this Court recommends be granted in full. Although Defendants claimed in their Response to (original) Petition that such fees and costs were unreasonable, this Court disagrees, finding that none of the fees and costs would have been expended had Defendants complied, in good faith, with the Consent Decree.[8]

---

[8] Specifically, JMS submitted invoice #13029, dated May 6, 1998, for 4.75 hours of legal work, at $140 per hour, (total $655), for counsel to review the pleadings, correspondence and environmental reports in this matter, to research the Federal Rules of Civil Procedure regarding pleadings, post-judgment remedies, contempt of court proceedings, and petitions regarding attorney's fees, and to prepare correspondence. Invoice # 13108, dated June 8, 1998, was for 5.25 hours of legal work, at $150 per hour, for the preparation of the Petition to Show Cause and Petition for Attorney's Fees, and various other matters, and .5 hours, at $275 per hour, for consultation with a senior partner regarding Rule to Show Cause and Petition for Attorney's Fees (total $925). Invoice # 13178, dated July 14, 1998, was for 2 hours of legal work, at $150 per hour, for receipt/review of the pleadings of the court minute order and teleconference with

(continued...)

B.  The Supplemental Petition for Attorney's Fees and Amended Petition to Show Cause.

On February 23, 2001, JMS filed its Amended Petition for Rule to Show Cause Against Bulk Petroleum and Mr. Darshan Dhaliwal, Individually, and on April 9, 2001, JMS filed its Supplemental Petition for Attorney's Fees (incorporating the (original) Petition for Attorney's Fees). These are the two Motions presently before the Court, and each will be addressed in turn.

In its Amended Petition for Rule to Show Cause, JMS explains that it has been more than three years since the entry of the Consent Order, and that Defendants have yet to obtain administrative closure of the JMS property. JMS maintains that it sent Counsel for Defendants a letter, on June 7, 2000, specifically requesting a remediation of the site and adjacent property, but that Defendants

---

[8](...continued)
Judge's clerk with client regarding damages affecting underlying property; 2.5 hours at $150 per hour for research and communication with client regarding Lis Pendens and the preparation of the Lis Pendens Notice; 3.5 hours at $275 per hour (senior partner) for reviewing of file and Order, multiple teleconferences with environmental expert, and conferences with client; and 3.75 hours at $150 per hour for preparation of attorney's fee petition, review of loan application and proposal, and calculation of damages and court appearances (total $2200). There was also a $13 charge for parking. The total, therefore, comes to $3803.00. (See Exhibit E in Response to (original) Petition for actual invoices.)

never responded. On July 8, 2000, Counsel for JMS, again, wrote Counsel for Defendants a letter demanding remediation, and on August 14, 2000, Counsel for Defendants finally responded via letter, stating that Defendants were "in the process of reviewing all alternatives necessary in order for the IEPA to issue a no further remediation letter." On August 15, 2000, JMS sent another letter to Defendants, reminding them that Defendants had been in the process of reviewing the contamination for years, but had not yet provided a satisfactory solution to the IEPA.

On August 23, 2000, Defendants' environmental consultant forwarded to JMS's counsel a letter to the IEPA (which was dated July 31, 2000), which discussed the steps being taken to address the IEPA's comments in its April 7, 2000 letter regarding the Corrective Action Completion Report.[9] However, typical of Defendants, this

---

[9] Apparently, Defendants' environmental consultant, ISO Technologies, Inc., prepared a report, on July 31, 2000, for the IEPA, to secure a "no further remediation letter", after the IEPA's April 7, 2000 correspondence denied administrative closure of the property. However, Defendants maintain that, because of a fall-out between ISO Technologies, Inc. and themselves, they terminated their relationship with ISO Technologies, Inc. and hired United Environmental Consultants, Inc. to continue steps necessary to obtain administrative closure. (They do not provide a date, however, of when they terminated ISO Technologies, Inc.) Defendants further attest that they are in the process of purchasing adjacent property, that will (supposedly) allow them a more expedited closure of the JMS property, through the review
(continued...)

letter was sent without any consultation with JMS, although the Consent Decree clearly calls for cooperation and consultation with JMS in obtaining administrative closure of the property. (This letter was also forwarded to JMS about three weeks after it was sent to the IEPA.)

On October 4, 2000 and again on January 17, 2001, Defendants' counsel informed this Court that Defendants were still awaiting a response from the IEPA. On February 13, 2001, however, Counsel for JMS spoke with Mr. Brian Bauer of the IEPA, who informed JMS's counsel that there was nothing for the IEPA to respond to, since no new Corrective Action Report was sent to the IEPA. Apparently, the July 31, 2000 letter from ISO Technologies, Inc. was merely a letter *addressing* the April 7, 2000 IEPA response, but did not serve to correct any of the problems. Therefore, despite Defendants' myriad excuses and misrepresentations, it appears that the property is no closer to administrative closure than it was three years ago. Furthermore – again, typical of Defendants' delay – on February 23, 2001, Defendants' third set of counsel since the entry of the

---

⁹(...continued)
and closure of the adjacent property via the LUST program. The Court finds that, after three years with minimal, if any, constructive results, four sets of attorneys, and (at least) two sets of environmental consultants, Defendants have, essentially, run out of excuses.

Consent Decree (Timothy S. Harris and Panna P. Patel of Quarles & Brady LLC, respectively) filed a motion to withdraw.

Consequently, in its Amended Petition for Rule to Show Cause, - believing that Defendants, especially Mr. Dhaliwal, have no intention of complying with the Consent Decree - JMS requests that the Court allow it to initiate the environmental investigation necessary to obtain administrative closure, and charge the expenses directly to Defendants. The Court recommends this course of action, and sees no principled reason why Defendants would object, if they are, indeed, sincere about obtaining administrative closure. Defendants have had more than three years to obtain administrative closure themselves. Instead of complying with the Consent Decree, they have compiled an abundance of excuses, and are on their fourth set of attorneys since the entry of the Consent Decree (as well as their second set of environmental consultants). It seems only fair - and in the interest of justice - to allow JMS to take the steps necessary to obtain administrative closure, and charge the ensuing costs to Bulk and Mr. Dhaliwal, individually, especially because the delay in obtaining administrative closure is costing JMS excessive expense and impeding its efforts to obtain new mortgages or entertain offers to sell the property. Therefore, this Court recommends this course of action, and recommends that Defendants be

ordered to reimburse JMS for all expenses related to obtaining administrative closure of the property.[10]

This Court further recommends that JMS's Supplemental Petition for Attorney's Fees be granted in part, with some minor mathematical adjustments. JMS's Supplemental Petition requests $18,615.75 in interim attorney's fees (not including the $3803.00 requested in the (original) fee petition). As a preliminary matter, JMS's Supplemental Petition has entries dated from July 14, 1998 to March 30, 2001, and, therefore, overlaps by two days (July 14 and July 15, 1998, respectively) with JMS's (original) Petition for Attorney's Fees. Because the Court has recommended that the (original) Petition for Attorney's Fees be granted in full (*see supra*), it necessarily needs to subtract any duplicate expenses from the Supplemental Petition. In order to expedite matters, and because

---

[10] JMS further requests that the Defendants be held in contempt of court. Although it is tempting, because of Defendants' egregious conduct in this matter, the Court does not recommend that Defendants be held in contempt of court at this time. If Defendants continue to violate the Consent Decree and/or any court orders, then this Court recommends that this issue be revisited. The Court also does not recommend that the underlying cause of action, dismissed pursuant to the Consent Decree, be reinstated *instanter* and placed on the trial call of the District Judge. Rather, this Court finds that allowing JMS to obtain administrative closure, and then charging the resulting expenses to Defendants, would be the most expedient and equitable result.

this error appears to be JMS's fault, the Court recommends that any fees and costs from the Supplemental Petition that are dated July 14 and 15, 1998, be deducted from the total, because JMS either already submitted them in its (original) Petition for Attorney's Fees, or should have submitted them in its (original) Petition for Attorney's Fees. Therefore, the Court recommends that $895.20 be deducted from the total in the Supplemental Petition.

Significantly, the Court notes that the total of $18,615.75 in the Supplemental Petition contains some mathematical errors. When the sum of all the itemized costs and fees is obtained, the total equals $17,817.50 (and not $18,615.75). When $895.20 (for the duplicate entries) is deducted from $17,817.50, the new total for the Supplemental Petition is $16,922.30. When the $3803.00 from the (original) Petition for Attorney's Fees is added to the $16,922.30 from the Supplemental Petition, the total for both fee petitions comes to **$20,725.30**. This total encompasses all fees and costs from April 28, 1998 to March 30, 2001, and does not encompass fees occurring after March 30, 2001.[11]

---

[11] Defendants argue that some of the attorney's fees sought by JMS were not incurred in connection with the enforcement of the Consent Decree, but, rather, were expenses incurred for work performed relative to its property. Therefore, Defendants request that the Court deduct, essentially, $9405.00 from the
(continued...)

## CONCLUSION

The Court recommends that JMS be allowed to obtain administrative closure of the property as set forth in the Consent Decree, and charge all ensuing expenses directly to Defendants Bulk and Mr. Dhaliwal, individually. After receiving the relevant receipts for the expenses, the Court recommends that Defendants have fifteen (15) days to reimburse JMS. The Court further recommends that Defendants pay JMS's attorney's fees and costs in the amount of $20,725.30, due to Defendants' abysmal noncompliance - spanning over three years - with the Consent Decree. The Court also recommends that any fees and costs related to enforcement of the Consent Decree, occurring after March 30, 2001 (the last entry in the Supplemental Petition), be awarded to JMS in any future fee petition.

---

[11](...continued)
Supplemental Petition. However, the Court finds that the entries submitted by JMS are sufficiently detailed, and recommends that, to the extent there is any ambiguity with respect to the entries, the Court find in favor of JMS, due to the dilatory tactics of Defendants. The Court also notes that many of the expenses relate to status conferences that JMS's counsel were forced to attend, due to Defendants' continual delays in enforcing the Consent Decree. Finally, Defendants argue that all legal services should have been rounded off to the nearest 1/10 hour instead of the nearest 1/4 hour. However, Defendants cite no case law for this proposition, and this Court notes that many fee petitions round off hours to the nearest 1/4.

DATED: June 14, 2001        RESPECTFULLY SUBMITTED:


_____
ARLANDER KEYS
United States Magistrate Judge


Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Marvin E. Aspen. *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).