**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JMS DEVELOPMENT COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 95 C 3275** |
| | ) | |
| **BULK PETROLEUM CORPORATION,** | ) | **Judge Marvin E. Aspen** |
| **et al.,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff JMS Development Company ("JMS") filed this lawsuit more than 24 years ago after discovering that petroleum storage tanks at a gas station operated by Defendants Bulk Petroleum Corporation and its principal, Darshan Dhaliwal (collectively "Bulk"), had leaked onto JMS's adjacent property. Plaintiff sought an order requiring Bulk to clean up the property pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and Illinois law. In August 1997, the parties signed a Consent Decree agreeing that Bulk would remediate the JMS property at its own expense and obtain a No Further Remediation letter from the Illinois Environmental Protection Agency ("IEPA"). By 2001, however, Bulk had not even begun to clean up the property.

As a result of Bulk's "abysmal noncompliance" and "unacceptable pattern of delay," the district judge adopted a recommendation from the magistrate judge (now retired Judge Arlander Keys) that JMS take over the process of cleaning up its own property (and, as necessary, the adjacent gas station property), and required Bulk to advance the anticipated cost of the clean-up with funds placed in an escrow account. *See JMS Dev. Co. v. Bulk Petroleum Corp.*, No. 95 C 3275, 2001 WL 686676 (N.D. Ill. June 15, 2001)

(Keys, M.J.) (also found at Doc. 151), *aff'd with modifications*, 2002 WL 252457 (N.D. Ill. Feb. 20, 2002) (Aspen, J.), *appeal dismissed*, 337 F.3d 822 (7th Cir. 2003). Judge Keys outlined the terms of this arrangement in a June 12, 2002 Memorandum Opinion and Order (the "Escrow Order"). *JMS Dev. Co. v. Bulk Petroleum Corp.*, No. 95 C 3275, 2002 WL 1303129, at *5 (N.D. Ill. June 13, 2002). Pursuant to the Escrow Order, Bulk remained free to object to specific invoice amounts, but if JMS disputed the objection Bulk had to pay up front and seek court resolution once the remediation was complete. *Id.* at *6-7. JMS thus faced the possibility of having to reimburse Bulk for any amounts inappropriately paid out to contractors. *Id.* at *7. JMS also was required to use its "best efforts" to help Bulk obtain reimbursement from the IEPA. *Id.* at *8.

The parties followed this procedure until March 2010 when the IEPA declared the property fully remediated and issued a No Further Remediation ("NFR") letter. Following additional delays caused by bankruptcy proceedings, Bulk submitted an application to the IEPA on November 5, 2015 seeking reimbursement for the clean-up in the amount of $368,811.80. More than three years later, on February 20, 2019, the IEPA issued a decision agreeing to reimburse Bulk $12,380.50 but otherwise denying its request. (Ex. 39, Doc. 341-20). Bulk did not appeal that decision.

Bulk now seeks an order determining its unresolved invoice objections, arguing that JMS improperly approved $328,207 in payments that should be returned to Bulk.[1]

---

[1] Bulk initially sought $351,607, which included $23,400 for work performed after the NFR letter was issued. According to Bulk, "it appears that JMS used the Escrow Order to pay for the commercial development of the property unrelated to the issuance of the NFR letter. Approving payment of costs unrelated to the issuance of the NFR letter is a clear abuse of the Escrow Order and bad faith." (Doc. 341, at 14) (emphasis removed). Bulk later withdrew this objection after confirming that it had never received or paid the invoice in question (#11-1106). (Doc. 343, at 9). Since this objection served as the only basis for Bulk's claim for attorney's fees due to JMS's alleged bad faith, this Court recommends that the request for fees be denied.

Specifically, Bulk objects that: (1) JMS authorized payment of excessive rates for the disposal and transportation of contaminated soil; (2) JMS failed to provide documentation supporting certain invoices in violation of its obligations under the Escrow Order; and (3) JMS should have obtained IEPA approval for certain excavation work. JMS responds that Bulk has waived its objection to several invoices, and denies that it owes Bulk any amounts related to the remediation work.

Since Judge Keys has retired, the district judge referred the motion to this Court for a report and recommendation. At the parties' request, the Court already addressed – and overruled – Bulk's general objection to paying for any costs "to the extent the IEPA [ultimately] determines that the costs were unnecessary for securing a No Further Remediation letter." (Order of 6/25/2019, Doc. 340). This opinion assumes the reader's familiarity with that Order and focuses on Bulk's specific objections. For reasons stated here, the Court recommends that those objections be sustained in part and overruled in part.

## **BACKGROUND**

### A.    The Escrow Order

Bulk's objections are governed by the June 12, 2002 Escrow Order, which required that Bulk place money in an Escrow Account to "pay for environmental remediation of, and obtain a 'no further remediation' letter from the [IEPA] regarding [the] real estate owned by JMS." *JMS Dev. Co.*, 2002 WL 1303129, at *5. To address Bulk's concerns about paying for invoices it deemed "unfair or inaccurate," the Escrow Order outlined procedures for submitting, approving, and reimbursing invoices. *Id.* at *4, 6-7. Specifically, JMS was required to submit invoices to Bulk, which had "fourteen (14)

3

calendar days (the 'Review Period') to dispute, in good faith, any such invoice by written notice to JMS, specifying in reasonable detail (i) the amount in dispute regarding such invoice and (ii) the basis for the dispute (collectively the 'Invoice Objection')." *Id.* at *6. JMS then had "fourteen (14) calendar days from its receipt of such Invoice Objection to attempt to resolve [Bulk's] objection to the invoice (the 'Resolution Period.')." *Id.* If JMS denied an Invoice Objection, the contractor would be paid in full for the work performed but Bulk would have an opportunity to seek court review and possible repayment from JMS once the remediation was complete. *Id.* at *7.

In setting forth this procedure, Judge Keys stated that JMS was required to "substantially cooperate with [Bulk] in [its] quest to obtain reimbursement from the IEPA," but found "no basis in law or reason for requiring [JMS] to pay [Bulk] for any amount the IEPA refuses to cover – particularly when the Consent Decree makes [Bulk] liable to pay for the entire remediation in the first instance." *Id.* at *5. The Escrow Order thus stated: "the Court finds that it is not [JMS]'s burden to guarantee the IEPA's reimbursement of the remediation costs. However, [JMS] is directed to use its best efforts to assist [Bulk] in achieving such reimbursement." *Id.* at *8.

### B.    Requirements for an NFR Letter

JMS retained HazChem Environmental Corp. ("HazChem") and its then-president Harry Eiler to perform the remediation work, which began in September 2002. (Ex. 9, Doc. 341-5, at 6). HazChem, in turn, subcontracted with Schrack Environmental Consulting, Inc. ("SECI") to check its work and handle the NFR application to the IEPA. As JMS's counsel Seth N. Kaberon explained in a November 30, 2004 letter to Bulk's counsel Patrick G. Cooke:

4

> SECI and its president, Ronald W. Schrack, were hired as the independent engineer to review HazChem's remediation work and prepare and sign the NFR application to the [IEPA]. The work done by SECI was required [and] not duplicative. . . . Harry Eiler advised me that, while not required by the IEPA, it is preferred by that agency that NFR applications be prepared and submitted by engineers independent of the primary remediation contractors, and that it is done most of the time.

(Ex. 51, 11/20/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 14).

To obtain an NFR letter where, as here, an underground storage tank leak is the source of environmental contamination, an operator must secure an approved Corrective Action Plan ("CAP") from the IEPA's Leaking Underground Storage Tank ("LUST") Program authorizing the work performed. (Ex. 54, Doc. 341-30, at 22, Bauer Dep., at 84). Any expense or cost not associated with an approved CAP will not be reimbursed by the IEPA. (*Id.* at 5, Bauer Dep., at 14). HazChem chose to proceed under 35 ILL. ADMIN. CODE § 731, which allowed the company to begin the clean-up work without first obtaining a pre-approved CAP.[2] HazChem understood, however, that an approved CAP would ultimately be required. In that regard, Eiler wrote a letter to JMS's counsel Kaberon on October 25, 2002, which (Kaberon) forwarded to Bulk's counsel (Cooke) on October 28, 2002, stating in relevant part:

> I have discussed this issue [CAP pre-approval] with Brian Bauer, the Illinois EPA project manager for this site. Mr. Bauer concurred that HazChem Environmental Corporation's (HazChem) Corrective Action Plan need not be pre-approved by the Agency, but can be incorporated as part of HazChem's final report and request for a "no further remediation" letter. HazChem will have all corrective action activities certified by a Licensed Professional Engineer and will comply with all the requirements of Part 731. HazChem's activities will also conform with the eligible costs for reimbursement provided in Part 732.605 in an effort to recover as much of the remediation costs for Bulk Petroleum as possible.

---

[2]     HazChem was able to proceed under § 731 (the "old law") because the contamination was reported prior to September 13, 1993, the date a new version of the Code (§ 732) went into effect. (Doc. 341, at 1). The Code's current provision, § 734, went into effect on June 24, 2002. (Ex. 54, Doc. 341-30, at 22-23, Bauer Dep., at 85-86).

5

(Ex. 47, Doc. 341-23, at 7-8). HazChem also represented that "the work will be performed in accordance with the requirements of the State of Illinois Title 35 Subpart 732," and that "[a]ll documentation that may be required for the IEPA LUST fund reimbursement program will be provided." (Ex. 8, 8/20/2002 Letter from Eiler to Kaberon, Doc. 341-4, at 2).

      **C. Invoices and Objections**

As contemplated by the Escrow Order, JMS started sending Bulk regular invoices for the remediation work. (Ex. 15, Doc. 341-8). The parties then exchanged correspondence concerning Bulk's Invoice Objections. (Ex. 50, Doc. 341-26; Ex. 51, Doc. 341-27). Two recurring objections are relevant here. First, Bulk repeatedly asked JMS to provide time records reflecting the hours worked and the services performed by project managers, technicians, equipment operators, and other personnel involved with the remediation. (*See, e.g.*, Ex. 50, Doc. 341-26, at 8, 9, 12-14, 16, 21). Second, Bulk objected that HazChem was charging excessive markups for the disposal and transportation of contaminated soil. In Bulk's view, the acceptable markup rate on such work was 15%, but it said HazChem was charging markups of "188%," "170%," and even "219%," which it deemed "well outside of an acceptable range for the IEPA." (*Id.* at 2, 5-6, 8, 11-12, 14, 20, 22). With respect to the time records, JMS notified Bulk that HazChem employees "do not punch time clocks or fill-out time cards; their time is reported orally to the company's office." (Ex. 51, Doc. 341-27, at 14). As for the markup rates, JMS insisted that they were "well within the industry norm," and called Bulk's suggestion that the rate was beyond what the IEPA would reimburse "false." (*Id.* at 2-4, 6, 13, 16).

### D. Efforts to Obtain an NFR Letter

By January 2004, JMS was reporting to the Court that most of the remediation work was done and it was in the process of preparing appropriate documents to submit to the IEPA for final approval. (Doc. 183). On March 31, 2004, SECI submitted a document styled as an Amended Corrective Action Plan to the IEPA in an effort to secure an NFR letter. (Ex. 33, Doc. 341-15, at 3). The IEPA apparently had some concerns about this proposed Amended CAP,[3] and on November 9, 2004, the agency rejected an associated September 17, 2004 Corrective Action Completion Report ("CACR"). (Ex. 31, Doc. 341-14).

The next proposed Amended CAP (incorrectly styled as a CACR according to IEPA project manager Brian Bauer) was submitted on December 8, 2005.[4] On April 24, 2006, the IEPA identified several problems with the December 8, 2005 CACR. (Ex. 20, Doc. 341-2, at 1) (referencing "the Agency's April 24, 2006 correspondence."). The April 24, 2006 letter is not in the record, but SECI submitted an Amended CAP dated October 24, 2006 in response to it. (*Id.* at 2). Shortly thereafter, on March 13, 2007, the IEPA issued a letter stating that the October 2006 CAP needed to be modified in order to secure final remediation approval. (Ex. 17, Doc. 341-9). SECI responded to the IEPA on June 7, 2007, (Doc. 321-12), and submitted a CACR on December 3, 2009, but it took until

---

[3]     Brian Bauer, the IEPA's project manager for the remediation work, made handwritten notes about the March 31, 2004 Amended CAP on November 4, 2004. (Ex. 55, Doc. 341-31). With respect to the removal of 15,000 gallons of water, Bauer wrote "Why?" (*Id.*).

[4]     The December 8, 2005 document is not in the record but Bauer referenced it in handwritten notes dated March 7, 2007. (Ex. 43, Doc. 341-22). Those notes reflect a date of December 16, 2005 for the CACR, which is when the IEPA received the document. (*Id.*; Ex. 54, Doc. 341-30, at 8-9, Bauer Dep., at 29-30).

March 24, 2010 before the IEPA finally determined that the remediation was complete and issued an NFR letter.  (Ex. 18, Doc. 341-10).[5]

### E.    The Reimbursement Application

To assist in preparing its reimbursement application to the IEPA, Bulk issued a subpoena to HazChem on May 6, 2015 seeking a variety of documents, including "[a]ll time cards for employees invoiced between 2001 and 2011 for the remediation at the Site.  Including but not limited to the time cards for all technicians, project managers, project engineers, and principal consultants invoiced."  (Ex. 58, Doc. 341-34, at 3, 7).  HazChem produced documents responsive to the subpoena on June 30, 2015 but did not have the requested time cards.  (*Id.* at 9-16).  Bulk submitted its reimbursement request on November 5, 2015 seeking $368,811.80 from the IEPA.  In response to the IEPA's request for additional documentation, Bulk issued a subpoena to Schrack (President of subcontractor SECI) on April 18, 2016 seeking, among other things, "[a]ll time cards for employees invoiced."  (Ex. 19, Doc. 341-11, at 6).  Schrack does not recall producing any documents in response to the subpoena.  (Ex. 52, Doc. 341-28, at 5, 30, Schrack Dep., at 17, 117).

More than three years later, on February 20, 2019, the IEPA issued a decision agreeing to reimburse Bulk $12,380.50 but otherwise denying its request.  (Ex. 39, 2/20/2019 Letter from IEPA to Bulk, Doc. 341-20).  The IEPA's stated reasons for denying specific costs fell into two categories relevant here:  (1) "Names, dates, and times worked for employees was not provided"; and (2) "deduction for costs associated with corrective

---

[5]        The December 3, 2009 CACR is not in the record.

action that was not conducted in accordance with an Agency approved plan." (*Id.* at 3-12). For unknown reasons, Bulk chose not to appeal the IEPA's decision.

## DISCUSSION

As noted, Bulk raises several arguments in support of its request for relief under the Escrow Order. First, Bulk argues that HazChem charged excessive markups for the disposal and transportation of contaminated soil. Second, Bulk argues that JMS failed to provide documentation supporting several invoices, including time records, job descriptions, and subcontractor invoices. According to Bulk, this failure left it unable to determine whether the charges were reasonable for purposes of the invoice objection process. It also meant Bulk did not have the necessary documentation as required for reimbursement by the IEPA, which resulted in the IEPA declining to cover many expenses. Bulk claims JMS's failure to provide documentation violated its obligation to use its "best efforts" to help Bulk obtain reimbursement. Relatedly, Bulk argues that JMS failed to use its "best efforts" by performing certain soil excavation work without ever getting it approved in a CAP. All told, Bulk seeks to recover $328,207 from JMS as follows: (1) $72,418.40 for unreasonable markups; (2) $69,037.50 for lack of documentation; and (3) $186,751.09 for costs not incorporated into an approved CAP.

JMS responds that Bulk has waived its objections to several invoices, and denies that it owes Bulk any amounts related to the remediation work.

## I.    Waiver

Before addressing the substantive arguments, the Court considers whether Bulk waived its right to object to certain invoices.

### A.   Waiver Based on Failure to Object Within the 14-day Review Period

For two of the invoices, JMS claims that Bulk failed to raise objections within the 14-day Review Period set forth by Judge Keys in the Escrow Order.  Bulk prepared a Summary Chart that sets forth the items from each invoice it is challenging, and the document(s) it is relying on to support each objection.  (Ex. 48, Summary Chart, Doc. 341-24).  Based on those citations, JMS argues Bulk did not make timely objections to Invoices #33622 and #34130.

#### 1.   Invoice #33622

Looking first to Invoice #33622 dated September 27, 2002, JMS sent the invoice to Bulk (by fax and FedEx) on October 2, 2002.  (Doc. 342-2).  Under the terms of the Escrow Order, Bulk then had 14 calendar days until October 16, 2002 to submit an Invoice Objection.  Bulk identifies three documents it claims set forth its objections to Invoice #33622 for lack of adequate documentation:  (1) a June 13, 2003 letter from Bulk's counsel to JMS's counsel (Ex. 50, Doc. 341-26, at 8); (2) a March 27, 2006 letter from Bulk's counsel to JMS's counsel (Ex. 56, Doc. 341-32); and (3) the May 6, 2015 subpoena to HazChem (Ex. 58, Doc. 341-34).  (Ex. 48, Doc. 341-24).  As JMS notes, the dates on these documents are between 8 months and more than 12 years past the 14-day Review Period.

Bulk does not deny that its objections to Invoice #33622 were untimely.  Thus, to the extent Bulk is arguing generally that JMS mishandled or improperly denied those objections, the arguments should be deemed waived.  This does not end the Court's inquiry, however, because Bulk insists that the timeliness objection is irrelevant for purposes of its separate objection concerning JMS's duty to use its "best efforts" to assist

10

Bulk in obtaining reimbursement. In Bulk's view, this language created an independent obligation on the part of JMS, aside from the invoice objection and resolution procedure, to provide supporting documentation at any time during the remediation process. (Doc. 343, at 5-6) ("Whether Bulk requested the supporting documentation in the invoice objection period or whether it requested it eight months or three years later is irrelevant.").

Since the "best efforts" language only appears in the portion of the Escrow Order relating to IEPA reimbursement, this Court agrees that it is meant to address something separate and apart from JMS's obligations in handling Invoice Objections. The Court considers this "best efforts" issue in more depth later in the opinion in a different context. It suffices here to say that Bulk should not be deemed to have waived its ability to argue that JMS's failure to provide documentation violated its duty to use its "best efforts" to assist Bulk in securing IEPA reimbursement notwithstanding the 14-day Review Period for Invoice Objections.

### 2. Invoice #34130

Turning to Invoice #34130 dated November 26, 2002, JMS faxed the invoice to Bulk on December 4, 2002 and sent it by FedEx for delivery on December 5, 2002. (Doc. 342-3). Bulk raised two types of objections to this invoice: lack of adequate documentation and excessive markups for soil disposal and soil transportation. Under the Escrow Order, Bulk had 14 calendar days until December 19, 2002 to submit an Invoice Objection. According to Bulk's Summary Chart, these objections appear in the following documents: (1) a February 6, 2003 letter from Bulk's counsel to JMS's counsel (Ex. 50, Doc. 341-26, at 5); and (2) the May 6, 2015 subpoena to HazChem (Ex. 58, Doc. 341-34). (Ex. 48, Doc. 341-24). JMS argues that the June 2003 letter is dated

11

approximately 6 weeks past the December 19, 2002 deadline for filing an Invoice Objection, and the subpoena is once again more than 12 years late.

Though not cited in the Summary Chart, Bulk notes that it first objected to Invoice #34130 much earlier in a December 23, 2002 letter from its counsel to JMS's counsel. (Ex. 50, 12/23/2002 Letter from Cooke to Kaberon, Doc. 341-26, at 2). This is still 4 days past the 14-day deadline, but Bulk notes that the objection concerned JMS's failure to provide "a complete copy of HazChem's November 26, 2002 Invoice, as required under the Escrow Order." (*Id*.). According to Bulk, since JMS "failed to comply with the notice requirements of the Escrow Order, the objection period had not yet expired." (Doc. 343, at 6). This Court agrees that the time period for Bulk to object to an invoice did not properly start until Bulk had a complete copy of that invoice in hand. Since the record does not contain any evidence as to when exactly JMS sent Bulk a *complete* copy of Invoice #34130, JMS's argument that Bulk failed to raise timely objections to it should be denied.

### B.    Waiver Based on Judicial Admission

JMS's second theory of waiver applies to objections related to Bulk's alleged overpayment of $72,418.40 due to unreasonable markups for the disposal and transportation of contaminated soil. During a hearing on April 10, 2019, this Court was considering whether to allow some discovery before briefing on Bulk's renewed Invoice Objections (Bulk wanted to depose the IEPA's Brian Bauer and SECI's Schrack; JMS said no discovery was necessary or permissible). Bulk's counsel made the following statement:

> And the one example that Attorney Kaberon gave on an objection here related to reasonable rates where they came back and said, well, **what's**

12

**your basis, Bulk, for opposing our rates?** You can review the renewed motion, and **that's really not an issue that Bulk is pursuing at the time** because it is – it gets into a rather – sort of money and vague sort of determination going back to 2002 to determine, well, what's a reasonable rate? Are we looking in the greater Chicagoland area or are we looking at Milwaukee? And, what, we're going to have dueling experts on that? I mean, I'm not proposing that. What I looked at – or what the defendants are looking at is really was it necessary, did they provide the supporting documentation, which was a repeated objection throughout the invoicing process.

(Doc. 342-5, at 14) (emphasis added). JMS argues that this constitutes a judicial admission that Bulk is not pursuing objections to HazChem's rates. (Doc. 342, at 3) (citing *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002) ("The verbal admission by SCI's counsel at oral argument [conceding that an arbitration agreement was unenforceable if construed to limit the plaintiff's ability to recover attorney's fees under Title VII] is a binding judicial admission, the same as any other formal concession made during the course of proceedings."); *In re Lefkas Gen. Partners No. 1017*, 153 B.R. 804, 807 (N.D. Ill. 1993) (noting that judicial admissions are "any 'deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings.")).

Bulk denies that its counsel made a "deliberate, clear, and unequivocal" verbal statement that it was foregoing recovery for excessive markups as required under *McCaskill.* (Doc. 343, at 8). At the time of the April 2019 hearing, Bulk says, "it seemed unlikely that the testimony to support the objections [to the unreasonableness of the markups] would materialize." (*Id.* at 9). Bulk believes that Schrack's June 19, 2019 deposition testimony now proves the markups were excessive and the argument should be allowed because it never unequivocally waived its "right to pursue the invoice

13

objections where, as has occurred, new evidence is revealed over the course of discovery." (*Id.*).

This Court declines to recommend a finding of waiver as to the excessive markup claims. Bulk's counsel made the statement in question in the context of discussing potential discovery, and so the Court is not persuaded that it may be construed as a broad, substantive waiver of a legal argument. As discussed in the next section, moreover, the Court is recommending that the excessive markup objection be overruled on the merits in any event.

### C.     Summary of Waiver Rulings

To summarize, JMS's arguments that Bulk waived its ability to object to certain invoices by submitting its objection letters too late or by making a judicial admission during a court hearing should be rejected. Though the Court agrees that the objections to Invoice #33622 were late, Bulk's separate objection concerning JMS's obligation to use its "best efforts" is timely. The "best efforts" objection, which applies to Invoice #33622 as well as other invoices, is addressed later in this opinion. (*See supra* pp. 23-28).

## II.    Excessive Markups

As mentioned in connection with JMS's waiver argument, Bulk objected on several occasions that HazChem's markups on the cost to dispose of and transport contaminated soil were excessive. (*See* Ex. 49, Summary Chart, Doc. 341-25). Bulk claims the actual cost to dispose of contaminated soil was $17 per load or ton, but HazChem charged $32 per load on two invoices and $42 per load on a third invoice, representing markups of 88% and 147%, respectively. According to Bulk, the industry standard for such markups

is only 15%, or $22 per load. Using this figure, Bulk seeks to recover $58,068.40, the amount it says it overpaid for the soil disposal work.[6] (*Id.*; Doc. 341, at 6-7).

Bulk makes a similar calculation in connection with the cost to transport contaminated soil. There, it argues the actual cost was $130 per load or ton, but HazChem charged $245 per load on two invoices and $285 per load on a third invoice, representing markups of 88% and $119%, respectively. According to Bulk, the industry standard for such markups is once again only 15%, or $149.50 per load. Despite this, Bulk adopts a higher rate of $200 per load based on testimony from SECI's Ronald Schrack, discussed below. Using that figure, Bulk seeks to recover $14,350, the amount it says it overpaid for the soil transportation work. (Ex. 49, Summary Chart, Doc. 341-25; Doc. 341, at 6-7).

The total amount allegedly overpaid that Bulk seeks to recover is $72,418.40 ($58,068.40 + $14,350). (*Id.*). In making the argument regarding excessive markups, Bulk ignores correspondence from JMS specifically asking Bulk to explain the basis for its claim of a 15% markup on soil disposal and soil transportation at the time the work was being performed, as well as the complete lack of evidence that Bulk ever provided a supporting foundation. In a December 23, 2002 objection letter, for example, Bulk claimed that HazChem's prices as set forth in the November 26, 2002 Invoice #34130 were "well outside of an acceptable range for the IEPA." (Ex. 50, 12/23/2002 Letter from Cooke to Kaberon, Doc. 341-26, at 2). JMS responded on December 26, 2002, explaining:

> Our environmental contractor [HazChem] has assured us that the $42.00 rate is well within the industry norm for rates charged by remediation contractors, which includes the contractor's overhead and markup. . . . You

---

[6]  By the Court's calculation, a 15% markup on $17 actually would be only $19.55 (not $22).

> do not explain the source of your supposed $22.00 per ton rate, nor do you explain whether it is a remedial contractor's rate or an at-the-gate rate charged by a landfill. If it is the latter, it is inapplicable. The landfill rate is only one component of the remedial contractor's rate, which is necessarily higher. And your suggestion that the $42.00 rate is beyond what the IEPA will reimburse is false.

(Ex. 51, 12/26/2002 Letter from Kaberon to Cooke, Doc. 341-27, at 2-3).

Four days later, on December 30, 2002, JMS sent another letter to Bulk stating:

> other than citing unnamed "consultants," your letter offers no information on the source or basis for your assertions of "average" rates of $22 per ton for soil disposal and $60 per sample for lab tests. We have no way of assessing whether those are real rates for anything, much less the applicable types of services, as discussed in my December 26[, 2002] letter.

(Ex. 51, 12/30/2002 Letter from Kaberon to Cooke, Doc. 341-27, at 4). JMS sent a similar letter to Bulk on November 30, 2004:

> Nowhere do the objections state what your clients consider to be reasonable rates for the particular services, and no rates offered by other contractors are listed. Your clients have offered nothing against which we could compare HazChem's or its subcontractors' rates and billing practices. . . . The amounts of those markups [on subcontractor invoices] are within standard industry ranges.

(Ex. 51, 11/30/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 13).[7]

These letters demonstrate that JMS made a pointed request for a "source" regarding the purported industry standard of a 15% markup, and Bulk has not submitted any evidence indicating it complied with that request, aside from repeating its own blanket assertion that HazChem's rates were unreasonable. (*See, e.g.*, Ex. 50, 2/6/2003 Letter from Cooke to Kaberon, Doc. 341-26, at 5-6) (claiming that the charges for soil disposal and transportation were "commercially unreasonable and unacceptable."); Ex. 50,

---

[7]    This letter is mistakenly dated November 30, 2003.

10/22/2004 Letter from Cooke to Kaberon, Doc. 341-26, at 12) (again stating generally that the soil disposal and transportation costs were "commercially unreasonable.")).

Having failed to provide JMS with contemporaneous evidence establishing the industry standard for markups in 2002 and 2003, Bulk now seeks to rely on the June 19, 2019 deposition testimony of SECI's Ronald Schrack, the engineer HazChem subcontracted with to handle the NFR application to the IEPA. Schrack testified that HazChem's "soil disposal costs and the transportation costs, based on what I saw, appear to be a bit more than what I would charge for a job site." (Ex. 52, Doc. 341-28, at 27, Schrack Dep., at 105). Looking in particular at the November 26, 2002 Invoice #34130, Schrack stated that the standard markup allowed by the IEPA was 10% to 12%:

> And case in point with the prices, the $42 per ton for disposal of the soils, the EPA allowed like, I think, a 10 or 12 percent markup. At that time I was getting disposal of soils into a landfill at $12 to $15 a yard, maybe $18 a yard. So that was one of my concerns, that the markup seemed to be a bit high in relation to what the EPA would reimburse for.

(*Id.* at 28, Schrack Dep., at 106). With respect to transportation costs, Schrack stated:

> [T]he transportation costs – at that time I was getting soils disposal going from where they were at up to – where did they – Zion landfill? That appears to be a little bit high, about $85 more a truckload than what I would have been charged. I would have been charged around $200 a truckload.

(*Id.*, Schrack Dep., at 106-07). Bulk says this testimony demonstrates conclusively that the rates HazChem was charging were excessive and unreasonable. This Court disagrees.

First and foremost, Schrack's deposition testimony in 2019 directly contradicts what he told JMS about HazChem's rates back in 2004. On November 30, 2004, Schrack wrote a letter to attorney Kaberon, copied to HazChem's president Harry Eiler, responding

to Bulk's October 22, 2004 Invoice Objection.  On the subject of soil disposal and soil transportation, Schrack said:

> In regards to the costs issues, the [L]UST owner/operator should provide a legal definition of 'commercially reasonable practices' since this statement appears to [be] the sole basis for the disagreement with the invoices submitted by HazChem.  The costs listed in the October 2[2], 2004 [objection letter] are typical for environmental services completed in the Chicago area.

(Doc. 342-7).  JMS conveyed that opinion to Bulk in its own November 30, 2004 letter: "We have . . . been assured by both HazChem and the independent engineer, Ron Schrack, who prepared and signed the latest reports to the [IEPA], that all of the rates charged in HazChem's invoices are within the industry norm in the Chicago area."  (Ex. 51, 11/30/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 13).  In this Court's view, JMS was entitled to rely on the letter Schrack sent in 2004 when the invoices were being issued and paid, and cannot fairly be bound by testimony he provided 15 years later.

This conclusion is bolstered by affidavits that JMS submitted from its owner, Mark Michael, and its attorney, Seth Kaberon, stating that Schrack never told them about his alleged concerns that HazChem's rates were excessive or above what the IEPA would allow for reimbursement.  (Doc. 342-1, Kaberon Aff. ¶ 3; Doc. 342-6, Mark Michael Aff. ¶ 2).  Bulk does not point to any contrary evidence.  Absent some indication that Schrack conveyed his reservations about HazChem's rates to JMS, JMS cannot be faulted for accepting the uncontroverted representations it received from HazChem (bolstered by Schrack's own November 30, 2004 letter) that its rates were appropriate and within industry standards.[8]

---

[8]     Schrack testified that he remembered "having some discussions with Harry [Eiler of HazChem] about the billing rates and those sort of things and my concern that they would not fit within the framework of what's allowable by the EPA," and claims Eiler "[p]retty much" told him to

Another problem with Schrack's testimony is that even today he fails to provide support for his claim that the industry standard for markups in 2002 and 2003 was 15%. For example, he has not produced invoices showing what SECI charged its own clients at that time, much less that the markup was only 15%. Nor is there any evidence demonstrating that other companies were actually willing to do remediation work at a 15% markup rate. Moreover, Bauer from the IEPA testified that there were no published rates for reimbursement under § 731 projects such as the one at issue here, which perhaps explains why Schrack did not cite to any IEPA regulations to support his testimony. (Ex. 54, Doc. 341-30, at 20-21, Bauer Dep., at 77-78). HazChem expressly told JMS's counsel about the lack of published rates on August 20, 2002: "The IEPA has not published acceptable unit costs for reimbursable items, rather they have published eligible costs in Title 35 Section 732.605 that are associated with corrective action activities." (Ex. 8, 8/20/2002 Letter from Eiler to Kaberon, Doc. 341-4, at 1).[9] Again, there is no contrary evidence on this issue from Bulk.

For the reasons stated, Bulk's objection that it overpaid $72,418.40 for the disposal and transportation of contaminated soil should be overruled. Bulk never provided JMS

---

"mind my own business." (Ex. 52, Doc. 341-28, at 27-28, Schrack Dep., at 105-06). As a preliminary matter, Schrack did not provide any details about these alleged discussions (date, time, place, format, other persons involved), so his testimony more than a decade later is not persuasive evidence of HazChem's knowledge. Even assuming the conversations took place, there is no evidence that JMS knew about them, and Bulk does not dispute that both HazChem and SECI were independent contractors as opposed to agents of JMS. *See, e.g., Petrovich v. Share Health Plan of Ill., Inc.*, 188 Ill. 2d 17, 31, 719 N.E.2d 756, 765 (1999) ("As a general rule, no vicarious liability exists for the actions of independent contractors" unless an agency relationship is also established); *Brettman v. M & G Truck Brokerage, Inc.*, 2019 IL App (2d) 180236, at ¶ 31 ("An independent contractor undertakes to produce a certain result, but he is not under the control of the person for whom he does the work.").

[9]      It appears that the IEPA eventually established maximum rates for § 732 and § 734 remediation projects, (Ex. 54, Doc. 341-30, at 21, Bauer Dep., at 78), but Bulk has not submitted those rates to the Court or indicated when exactly they went into effect. Nor does Bulk argue that the maximum rates constituted the industry standard for HazChem's work in 2002 and 2003.

with any evidence supporting a 15% markup, and Schrack's unsupported testimony more than 15 years after the fact is inadequate to demonstrate that HazChem's rates were excessive.

## III.   Failure to Provide Documentation

Bulk next seeks to recover $69,037.50 for expenses it says JMS never supported with adequate documentation.  Bulk objects that without the documentation, it did not have a fair opportunity to evaluate the reasonableness of the underlying costs.  (Doc. 341, at 4-5).  In addition, Bulk argues that JMS's failure to provide documentation reflects that it did not use its best efforts to help Bulk obtain reimbursement from the IEPA as required by the Escrow Order.  (*Id.* at 11-13).

### A.   Obligations Under the Invoice Objection Procedure

Bulk identifies three categories of documents it says JMS never produced, which then hindered Bulk's ability to assess the reasonableness of the work performed:  (1) time records; (2) job descriptions; and (3) subcontractor invoices.  The Court addresses each in turn.

There is no dispute that Bulk asked JMS to provide time records for the technicians, project managers, consultants, and other personnel who worked on the remediation.  In its June 13, 2003 objection letter, for example, Bulk's counsel asked JMS's counsel to "[k]indly provide me with the technician's time records for the May 28[, 2003] Invoice, as well as time records for time reflected in previously submitted invoices." (Ex. 50, 6/13/2003 Letter from Cooke to Kaberon, Doc. 341-26, at 8).  Bulk repeated the request for time records in at least three subsequent objection letters dated October 29, 2003, October 22, 2004, and November 22, 2006.  (Ex. 50, Doc. 341-26, at 9, 11-14).

20

In responding to these objections, JMS made it clear that HazChem did not maintain time records in the regular course of business. On October 30, 2003, JMS's counsel wrote a letter to Bulk's counsel stating:

> That work [installation of two off-site monitoring wells], like all work on the project, was supervised by a HazChem project manager, whose time was included on the HazChem invoice. No underlying time records are available.

(Ex. 51, 10/30/2003 Letter from Kaberon to Cooke, Doc. 341-27, at 12). JMS's counsel clarified this point in a November 30, 2004 letter:

> HazChem employees, including supervisors and equipment operators, do not punch time clocks or fill-out time cards; their time is reported orally to the company's office.

(Ex. 51, 11/30/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 14).

The question now is whether JMS was somehow responsible for providing Bulk with documents that HazChem did not have. Under the terms of the Escrow Order, JMS was required to promptly submit all invoices for work performed or expenses incurred to Bulk and its attorneys. *JMS Dev. Co.*, 2002 WL 1303129, at *6. Though JMS was then tasked with attempting to resolve Bulk's objections to those invoices, there is no suggestion that the 14-day Resolution Period might involve JMS having an obligation to tell HazChem to create records it did not otherwise maintain in the ordinary course of business. Bulk notes that HazChem could have used the IEPA's Personnel Weekly Work Sheet in lieu of maintaining separate time cards, (Ex. 57, Doc. 341-33), but Bulk cites no evidence indicating that it told JMS about the Work Sheet or asked JMS to instruct HazChem to use it. Under these circumstances, Bulk's objection that JMS did not satisfy its obligations under the invoice objection procedure by failing to provide time records that did not exist should be overruled.

21

For similar reasons, Bulk's objection that JMS needed to provide job descriptions for each employee lacks merit. The only example Bulk cites concerns Invoices #34130 and #34276. (Doc. 341, at 5). Bulk sent an objection letter to those invoices on February 6, 2003 asking JMS to "explain the tasks performed by" equipment operators, project managers, and environmental technicians so Bulk could "make certain" it was "not billed for work not performed or billed several times for the same work." (Ex. 50, 2/6/2003 Letter from Cooke to Kaberon, Doc. 341-26, at 6). JMS responded the next day stating that "equipment operators operated equipment, project managers managed the project, and environmental technicians took samples and performed various other tasks." (Ex. 51, 2/7/2003 Letter from Kaberon to Cooke, Doc. 341-27, at 7). JMS also confirmed that "[a]ll work was actually performed" and "[t]here was no double-billing of any sort." (*Id.*). The record contains no evidence that Bulk ever followed up seeking further explanation. (Doc. 342, at 6). Notably, the IEPA's own Personnel Weekly Work Sheet asks for each employee's name and job title, but not a job description. (Ex. 57, Doc. 341-33). JMS responded adequately to Bulk's request for job descriptions and the related invoice objections should therefore be overruled.

Bulk finally argues that JMS improperly withheld "invoices or receipts from subcontractors." (Doc. 341, at 4). Bulk requested these documents in objection letters dated October 22, 2004 and November 22, 2006. (Ex. 50, Doc. 341-26, at 12, 13, 16). The problem for Bulk is that JMS made clear that all such subcontractor invoices had been produced along with the HazChem invoices. On November 30, 2004, JMS reported that "HazChem has advised us that all supporting documentation has been attached. Any subcontractor invoices have been included. Otherwise, Hazchem performed the listed

tasks." (Ex. 51, 11/30/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 13). JMS provided similar confirmation on November 29, 2006: "All available supporting documentation was attached to the invoice." (Ex. 51, 11/29/2006 Letter from Kaberon to Cooke, Doc. 341-27, at 16). Absent any evidence that JMS withheld subcontractor invoices it received from HazChem, Bulk's objection that JMS failed to produce invoices as required by the invoice objection procedure should be overruled.

### B.  Obligation to Use "Best Efforts"

Bulk argues that JMS should still return the $69,037.50 because JMS had an obligation to produce documents as part of its independent duty to use its "best efforts" to help Bulk obtain reimbursement. Brian Bauer from the IEPA testified at his deposition that owners/operators need to provide "the names of the employees, the dates they worked and the hours that they worked as part of the supporting documentation to justify a claim [for reimbursement]. You can't just come in with a lump sum." (Ex. 54, Doc. 341-30, at 15, Bauer Dep., at 57).[10] As discussed, Bulk asked JMS to provide time records in several of its Invoice Objection letters but HazChem did not maintain time records in the regular course of business. (Doc. 341, at 13). Bulk now claims that JMS is directly liable for deficiencies in HazChem's recordkeeping practices. However, the parties' course of dealing under the Escrow Order and the history surrounding the creation of that Order do not support Bulk's position.

---

[10]     Bulk cites 35 ILL. ADMIN. CODE § 732.601(b)(9) for the proposition that an application for reimbursement from the IEPA must include an "accounting of all costs, including but not limited to, invoices, receipts, and supporting documentation showing the dates and descriptions of the work performed." (Doc. 341, at 11). Bulk submitted a copy of that provision from 2002 but it does not have a subsection (b)(9) or otherwise contain the cited language. (Doc. 341-35). The Court was able to locate the language in a separate code provision, § 734.605(b)(9), which went into effect on March 1, 2006. As noted, however, HazChem conducted the remediation work under § 731, not § 734.

### 1.    Course of Dealing

Bulk claims that early in the remediation process, HazChem expressly promised to provide all documents necessary for reimbursement.  On August 20, 2002, HazChem's then-president Harry Eiler wrote a letter to JMS's counsel Kaberon stating: "All documentation that may be required for the IEPA LUST fund reimbursement program will be provided."  (Ex. 8, 8/20/2002 Letter from Eiler to Kaberon, Doc. 341-4, at 2).  Bulk argues that "HazChem lacked any practical experience with the reimbursement process" and "was not familiar with the statutory requirements for plan approval or reimbursement." (Doc. 341, at 11-12).  As a result, HazChem subcontracted with Schrack (of SECI) to do that work.  (Ex. 53, Doc. 341-29, at 6, Eiler Dep., at 21) ("Ron Schrack was our main subcontractor . . . [a]nd if someone wanted to pursue reimbursement, that was his expertise.").  Schrack testified at his June 2019 deposition that he is familiar with the requirements for reimbursement under the LUST program, and for each employee,

> you have to list – they have weekly worksheets where you have to list the time they came on the job site and the time they left the job site each day. So the level of scrutiny that's placed upon these numbers is pretty extreme with the agency.  You have to have some pretty detailed information in order to obtain reimbursement.

(Ex. 52, Doc. 341-28, at 8, 28, Schrack Dep., at 28-29, 107).  In Bulk's view, "[h]ad JMS, or its counsel, simply checked with SECI, the expert in reimbursement, it could have confirmed Bulk's position regarding the lack of supporting documentation."  (Doc. 341, at 12).

This argument might carry more weight if Bulk had actually told JMS that it wanted the time records because they were necessary to secure reimbursement from the IEPA. A review of Bulk's correspondence, however, shows it never made such a claim or in any

way notified JMS that reimbursement may be compromised without the time records. (Ex. 50, 6/13/2003 Letter from Cooke to Kaberon, Doc. 341-26, at 8; Ex. 50, 10/29/2003 Letter from Cooke to Kaberon, Doc. 341-26, at 9; Ex. 50, 10/22/2004 Letter from Cooke to Kaberon, Doc. 341-26, at 12-14; Ex. 50, 11/22/2006 Letter from Cooke to Kaberon, Doc. 341-26, at 16; Ex. 50, 10/11/2007 Letter from Cooke to Kaberon, Doc. 341-26, at 18-19; Ex. 50, 3/6/2008 Letter from Cooke to Kaberon, Doc. 341-26, at 21). There is likewise nothing in the record to suggest that Schrack personally informed JMS about the importance of time records. And as stated previously, Bulk did not ask JMS or HazChem to use the IEPA's Personnel Weekly Work Sheet, much less explain that this would assist with reimbursement.

Without any evidence that Bulk told JMS it needed time records for reimbursement, or that JMS affirmatively knew this to be the case, the only way JMS could be liable to Bulk is if the Escrow Order *mandated* that JMS know the specific documentary requirements and instruct HazChem in that regard, or made JMS constructively responsible for HazChem's recordkeeping practices. (Doc. 343, at 3-4) (arguing that JMS "should have known that reimbursement required supporting documentation."). But it does not.

### 2. History of the Escrow Order

The Escrow Order became necessary in 2002 after Bulk spent four years doing absolutely nothing to clean up JMS's contaminated property. Bulk's "bad faith" and "abysmal noncompliance" led the court to take the remediation efforts out of Bulk's hands and transfer responsibility to JMS. *See JMS Dev. Co.*, 337 F.3d at 824. The "best efforts" provision of the Escrow Order arose in response to Bulk's attempt to make JMS

"guarantee that the IEPA reimburse Defendants for all amounts it expends in achieving remediation." *JMS Dev. Co.*, 2002 WL 1303129, at *5. Judge Keys found that Bulk's request "exceeds all limits of good judgment" but agreed that JMS should "substantially cooperate" with Bulk's reimbursement effort and use its "best efforts to assist [Bulk] in achieving such reimbursement." *Id.* at *5, 7, 8. The Escrow Order is silent as to what the phrases "substantially cooperate" and "best efforts" mean, or how JMS's actions in that regard are to be evaluated. In this Court's view, however, Bulk cannot rely on these terms to impose an affirmative duty on JMS to learn the documentary requirements for reimbursement or make JMS responsible for any deficiencies in HazChem's recordkeeping.

As an initial matter, Judge Keys made clear that there was "no basis in law or reason for requiring [JMS] to pay [Bulk] for any amount the IEPA refuses to cover – particularly when the Consent Decree makes [Bulk] liable to pay for the entire remediation in the first instance." *Id.* To the extent Bulk only seeks repayment for expenses the IEPA would not cover due to inadequate documentation, it arguably is attempting to circumvent the express language of the Escrow Order. More importantly, this Court finds no basis for inferring that JMS was required to educate itself on the documents needed for reimbursement. The burden of preparing the reimbursement application (and thus knowing what was required for that application) fell squarely and exclusively on Bulk. (*See* Doc. 167, Order of 12/9/2002) ("JMS is not [required] to initiate such a request [for reimbursement].").[11] JMS's obligation to help Bulk achieve its desired result does not

---

[11] For logical consistency, this Court views Judge Keys' use of the term "requested" in place of "required" to be a scrivener's error. (Doc. 167).

logically include taking on Bulk's responsibility to know the requirements for a proper reimbursement application in the first instance.

Also unavailing is Bulk's objection that JMS is responsible for hiring a contractor that was not qualified for the job. JMS identified HazChem as the intended contractor at the time of the Escrow Order, and Judge Keys referenced the company by name. *JMS Dev. Co.*, 2002 WL 1303129, at *6. Bulk points to no evidence that it objected to HazChem or proposed an alternative contractor to do the work. Bulk did start objecting to HazChem's qualifications in October 2004, but not because of any concerns regarding documentation. Rather, Bulk questioned HazChem's decision to hire SECI two years earlier. (Ex. 50, 10/22/2004 Letter from Cooke to Kaberon, Doc. 341-26, at 13) ("[I]f HazChem had to retain another environmental remediation management company, it appears that HazChem . . . lacked the competence to undertake this project from the beginning."; Ex. 34, 9/25/2002 Letter from SECI to HazChem, Doc. 341-16). JMS addressed this concern in a November 30, 2004 letter, explaining that SECI and Schrack "were hired as the independent engineer to review HazChem's remediation work and prepare and sign the NFR application." (Ex. 51, 11/30/2004 Letter from Kaberon to Cooke, Doc. 341-27, at 14). (*See also* Ex. 51, 11/29/2006 Letter from Kaberon to Cooke, Doc. 341-27, at 16) ("[U]tilizing Schrack was consistent with customary practices in the industry.")). Nothing in this correspondence put JMS on notice that time records were necessary for reimbursement, or that HazChem was somehow unqualified to conduct the remediation because it failed to maintain those records.[12]

---

[12] Bulk stresses that it issued subpoenas to HazChem in 2015 and SECI in 2016 requesting time records (among other documents). (Doc. 341, at 13). Since these were not requests *to JMS*, and were issued years after JMS's relationship with HazChem and SECI had ended, JMS cannot be responsible for any deficiencies in the responses provided.

Moreover, JMS notified Bulk early during the remediation process that HazChem did not maintain time records. Bulk never responded that such records were necessary to obtain reimbursement from the IEPA or asked HazChem to utilize the IEPA's Personnel Weekly Work Sheet. Had it done so, and JMS then refused, Bulk would have an argument that JMS had failed to use its best efforts to help Bulk obtain reimbursement. It is also worth noting that Bulk has only itself to blame for the fact that JMS handled the remediation. After all, Bulk had four years to hire any contractor it chose and dictate which documents it wanted maintained and completed, but took no action. Under these circumstances, Bulk's lament that JMS did not hire an adequate contractor and should have known more information about the reimbursement process than Bulk did is not persuasive.

On the record presented Bulk's request for repayment of $69,037.50 should be denied and its corresponding Invoice Objections overruled.

## IV.    Failure to Incorporate Soil Remediation Work into an Approved Corrective Action Plan ("CAP")

Bulk finally seeks to recover $186,751.09 for soil remediation work that was never incorporated into an approved CAP. This argument focuses on the excavation of 4,233.45 tons of contaminated soil and the removal of 15,000 gallons of contaminated water in 2002 and 2003. The IEPA's Brian Bauer testified at his recent deposition that any expense or cost not associated with an approved CAP will not be reimbursed. (Ex. 54, Doc. 341-30, at 5, Bauer Dep., at 14). Initially, SECI (the subcontractor hired to file the NFR application) tried to incorporate the 2002-2003 soil remediation work into a CAP. Specifically, SECI submitted an Amended CAP to the IEPA dated March 31, 2004, which stated:

28

> A total of 238 truck loads of contaminated soils (approximately 4,233.45 tons) were transported to Onyx Zion Landfill . . . for off-site disposal between November 11, 2002 and October 16, 2003. . . . In addition, approximately 15,000 gallons of perched water which exhibited a petroleum sheen were removed and transported to Ortek Corporation . . . for off-site disposal between October 16, 2003 and October 30, 2003.

(Ex. 33, Doc. 341-15, at 15). Similarly, Schrack's cover letter to the IEPA sending the Amended CAP reported, "[t]he remedial efforts conducted at the subject property involved the excavation and disposal of 4,233.45 tons of petroleum impacted soils, [and] the removal and disposal of 15,000 gallons of petroleum impacted groundwater." (*Id.* at 1).

Bauer (from the IEPA) had some concerns about this work, which he recorded in handwritten notes dated November 4, 2004. With respect to the removal of 15,000 gallons of contaminated water, for example, Bauer wrote "Why?" (Ex. 55, Doc. 341-31, at 1). At his June 2019 deposition, Bauer clarified that the March 31, 2004 Amended CAP lacked sufficient technical documentation:

> Q. And going back to the initial 4,200 tons of soil that were excavated and the 15,000 gallons of groundwater that was removed, as discussed in Exhibit 33, the March 31, 2004, amended corrective action plan, is it fair to say that there's – the plan does not provide technical documentation as to why that remediation was conducted?
>
> A. Yes.

(Ex. 54, Doc. 341-30, at 12, Bauer Dep., at 45). (*See also id.* at 14, Bauer Dep., at 52) ("Q. [G]oing all the way back to the . . . March 31, 2004 corrective action plan, there was no technical support as to the excavation and backfill cost, correct? A. Correct.")).

The IEPA rejected the March 31, 2004 Amended CAP and an associated September 17, 2004 Corrective Action Completion Report ("CACR") on November 9, 2004. (Ex. 31, Doc. 341-14). Regarding soil and excavation work, the rejection letter said: "[a] cross section that exhibits the depth of all the excavations must be provided to

the Agency." (*Id.* at 1). The next proposed Amended CAP was dated December 8, 2005.[13] According to deposition testimony from Bauer, it sought to close out the site under the Tiered Approach to Corrective Action Objectives ("TACO") Program, which "is the Illinois EPA's method for developing remediation objectives for contaminated soil and groundwater." (Ex. 54, Doc. 341-30, at 9, Bauer Dep., at 31; https://www2.illinois.gov/epa/topics/cleanup-programs/taco/Pages/default.aspx ("IEPA TACO Webpage"), last visited 12/9/2019)).[14] As a result, SECI was no longer seeking approval of the work done to remove 4,233.45 tons of contaminated soil or 15,000 gallons of contaminated water. Bauer explained the significance of this decision while testifying about some handwritten notes he made on April 18, 2006 regarding the Amended Fourth CACR:

> I believe that when the report came in, that they were looking at, you know, the TACO, Tiered Approach to Corrective Action Objectives. So they were trying to risk base out the site to close out the site. So it was when they risk based it, they just looked at risking everything away and not looking at why they did the excavation or anything. Just went back and said, you know, like, really, the excavation didn't occur and this is where we're at and we're just going to close it all out using TACO and land use restrictions and things like that and risk base it.

(Ex. 54, Doc. 341-30, at 9, Bauer Dep., at 31; Ex. 43, Doc. 341-22) (the notes indicate the IEPA received the Amended Fourth CACR on December 16, 2005)). *See also* IEPA

---

[13]     Bauer testified at his deposition that the December 8, 2005 document was improperly styled as an Amended Fourth CACR. (Ex. 54, Doc. 341-30, at 8, Bauer Dep., at 28). The document is not in the record but since Bauer referred to it in his handwritten notes as a CACR, the Court adopts that nomenclature.

[14]     "TACO provides flexibility to site owners and operators in developing site-specific remediation objectives. It's now the site owners and operators who decide how best to manage their sites within TACO guidelines. However, this determination of site-specific remediation objectives is subject to Illinois EPA review and approval." https://www2.illinois.gov/epa/topics/cleanup-programs/taco/fact-sheets/Pages/default.aspx, last visited 12/9/2019.

TACO Webpage ("Remediation objections generated by TACO are risk-based and site-specific.") (last visited 11/20/2019).

On April 24, 2006, the IEPA identified several problems with the December 8, 2005 CACR. (Ex. 20, Doc. 341-2, at 1) (referencing "the Agency's April 24, 2006 correspondence."). The April 24, 2006 letter is not in the record, but SECI responded to it on May 26, 2006, and subsequently submitted another proposed Amended CAP dated October 24, 2006. (Ex. 30, Doc. 341-13, at 2; Ex. 20, Doc. 341-12). As with the December 2005 CACR, this new Amended CAP did not include the 2002-2003 soil excavation work.

SECI and the IEPA exchanged additional correspondence over the next few years and on March 24, 2010, the IEPA finally issued an NFR letter. (Ex. 18, Doc. 341-10). It is undisputed that the approved CAP supporting that NFR letter did not include the soil excavation work. (Ex. 54, Doc. 341-30, at 17, Bauer Dep., at 64) ("The approved corrective action plan was using TACO; no excavation required."). As a result, the IEPA declined to reimburse Bulk $186,751.09 associated with that work:

> Q. And this is consistent with the 2019 reimbursement letter that you sent in February, correct? This note about the 180,000 was for excavation that was not needed. Approved CAP was using TACO. No excavation required.

> A. That's correct.

(*Id.*; Ex. 39, 2/20/2019 Letter from the IEPA to Bulk, Doc. 341-20, at 4-10 (declining to pay for "costs associated with corrective action that was not conducted in accordance with an Agency approved plan.")).

Bulk argues that JMS's failure to incorporate the 2002-2003 soil excavation work into an approved CAP violated its duty to use its "best efforts" to help Bulk obtain

31

reimbursement. (Doc. 341, at 9). JMS construes this as an improper attempt by Bulk to revive its rejected argument that JMS was required to obtain pre-approval of a CAP prior to conducting the remediation work, an issue addressed by this Court in a previous Order. (Doc. 342, at 10-11; Doc. 167, Order of 12/9/2002; Doc. 340, Order of 6/25/2019, at 10-12). To the contrary, Bulk now concedes that no such *pre-approval* of a CAP was necessary and focuses here on JMS's failure to incorporate the soil excavation work into the post-remediation CAP that was ultimately approved by the IEPA. Failure to do so inevitably meant the IEPA would not reimburse that work. (Doc. 343, at 2). JMS ignores this aspect of Bulk's argument, stating in conclusory fashion that it "did in fact obtain approval of a CAP, which was necessary to obtain the NFR letter." (Doc. 342, at 11). Of course, this does not address whether the decision to effectively forfeit any recovery for the 2002-2003 soil excavation work by submitting a CAP that omitted such work constitutes evidence that JMS violated its obligations to use its "best efforts" to help Bulk obtain reimbursement for that work.

JMS does not deny knowing that the IEPA would not reimburse any expenses not ultimately included in an approved CAP. Nor is there any dispute that SECI initially tried to get CAP approval for the 2002-2003 soil excavation work, and then reversed course and removed it from consideration by pursuing relief under the TACO program. JMS offers absolutely no explanation for this decision, nor any indication why HazChem was unable to produce the technical documentation necessary to justify the excavation work. This Court is thus left only with JMS's cursory and inapposite argument that pre-approval of a CAP was not required. As Bulk noted in both its opening and reply briefs, that is not the argument it is making here.

HazChem's decision to conduct substantial soil excavation work is curious given that in 1999 and 2000 when the clean-up was in the initial stages, the plan was to close the site under the TACO program. The IEPA rejected two proposed CACRs on April 7, 2000, but in no way suggested that remediation under TACO was inappropriate. (Ex. 7, 4/7/2000 Letter from IEPA to Bulk, Doc. 341-3). It is unclear why HazChem chose not to proceed under TACO yet afterward sought CAP approval using TACO, thus rendering the soil excavation not reimbursable. JMS provides no explanation of how it could have used its "best efforts" to help Bulk obtain reimbursement for the soil excavation work despite abandoning any possibility for such reimbursement by excluding it from all proposed CAPs and CACRs from December 8, 2005 forward. Since JMS has not offered any persuasive response to Bulk's objection to paying $186,751.09 for soil excavation work, this Court recommends that the objection be sustained.

## **CONCLUSION**

For reasons stated above, Bulk's unresolved Invoice Objections should be sustained in part and overruled in part, and JMS should be ordered to refund Bulk $186,751.09. In light of Bulk's concession that JMS did not use the Escrow Account to pay for work performed after the NFR letter was issued, Bulk's request for attorney's fees for JMS's alleged bad faith should be denied.

Pursuant to FED. R. CIV. P. 72(b), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served.[15] Failure to file objections with the Honorable Marvin E. Aspen within

---

[15] Neither party has addressed which subsection of Rule 72 applies to this opinion. Since it appears that the case may be terminated once the invoice objections are resolved, the Court invokes Rule 72(b) for dispositive motions.

the specified time will result in a waiver of the right to appeal all findings, factual and legal,

made by this Court in the Report and Recommendation.

ENTER:

Dated: December 9, 2019

SHEILA FINNEGAN
United States Magistrate Judge